Good morning, Your Honors. May it please the Court, Wendy Coates, Counsel for Petitioner Mr. Nader Ben Ghalba. As this Court is aware, there are multiple issues in this case, the first being the question of the Court's jurisdiction, then the second going to whether Mr. Ben Ghalba has demonstrated changed circumstances, such that he would have an exception to the one-year bar for his asylum application. Then whether he filed following those changed circumstances within a reasonable period of time. And those two issues must be reached first before the substantive questions regarding his asylum application. Now, so even if you give him, you know, I think there wasn't an adverse credibility. So he was found to be credible. So we have to assume that he underwent this conversion or that he says that he did. But even if you assume that, the BIA found there was a six to nine months delay between his transformation and his filing because he feared returning to Tunisia at least by the spring of 2003 and didn't file his application until December of 2003. And isn't that delay unreasonable? No, Your Honor, and I'd like the Court to think of it this way. First, the BIA for the first time asked for a specific date of the conversion. One of the things that I think is troubling in this case is how you even calculate a six to nine month time delay when it's the BIA that first says there's no specificity of a date of when the conversion happened to then move forward. And I think that really underlines part of the problem in this case because his conversion, per his testimony, happened throughout the course of the spring of 2003. Well, but let me just give you the backdrop on this. You dispute the description of his conversion and argue that there was no delay. But isn't that a factual dispute that we have no jurisdiction over? Well, Your Honor, I think that's pretty – Because that gets tricky. Well, it gets tricky except that we circle back to that his testimony is deemed as true. And I think this comes into the BIA interjecting what is a quasi-credibility determination when they phrase the inconsistent testimony. Because early in his testimony, he used the phrase within the five years. And as I've looked at this and struggled saying, okay, what is at the root of this? Because as the testimony goes on, both the IJ and his counsel buckle him down to say, and it's through that testimony that he says, I stopped shaving completely in 2003. So we have this stop of shaving. So then this inconsistent testimony comes from this phrase earlier within the last five years, and this is this 2005 versus 2003. And I'd like to take it back to that question of we're talking about hair growth on the chin. So when he stopped shaving completely in 2003 – But when you're talking inconsistent testimony, that's a factual dispute. Well, arguably, Your Honor, it's not inconsistent. The beard had grown between 2003 and 2005 to more resemble the long religious beard. If you stop shaving immediately, there isn't hair growth there. The two years – when he says, I was wearing the beard, it became that length. But when you go to the submission of that asylum application, he swears at the filing of that application that it is the beard and it's going to keep growing. It's going to keep getting longer. It's going to mark him even more as a religiously observant Muslim. And so it's that BIA that says these are inconsistent when he did state affirmatively that he stopped shaving completely in 2003, and the beard continued to grow through that process. And I think that's where we come back to the problem of the years of this case and the different judges, because when Judge Einhorn accepted the asylum application – So how late – but if you don't give him any of that, how late is he? Isn't he like three years late? No, Your Honor, he can't be three years late. Well, when did he – what's his date of coming here? 2000. Well, when he came in 2000. Okay, and when was it filed? 2003. Okay, so that's three years. But the delay, the question of delay – Right, no, but I'm just saying, okay, what he had to overcome of not being within the year. Correct. Let me ask you this, too. Isn't there some – didn't he try to get married and when his adjustment of status didn't work out there, that's when he filed asylum? Your Honor, I will tell you very honestly, I do not know. I know that when I came into the case, as you go through the long – I mean, the years of history of this case and the changes – Is that in the record at all? Of why? Well, is it in the record that he tried to get married and he didn't get adjustment of status and that was before he filed for asylum, right? Well, Your Honor, I think it's very clear that through the process of those marriages – I mean, there's multiple, there's two issues there – that he had found a religious home and had been attending services and over the period of time had increased – not just increased his attendance, but through the attendance process and being in that religious community – Well, we're just talking a little bit past each other in this. And I understand where your arguments are, but I'm trying to establish exactly the dates and that that was going on, that he was trying to get an adjustment of status before he filed for asylum, just exactly that as a backdrop. I think the record would reflect, Your Honor, that during the period of time that those marriages were taking place, based on Mr. Bengal's testimony, he had not had a religious epiphany during that period of time under which he would have been eligible for asylum. I mean, that is also the crucial part of this. So the BIA faults your client for not specifying a date when his religious practices reached this turning point where he became fearful of returning to Tunisia. So can he identify a date? Well, Your Honor, from when I looked through the record, one of the things is you have the immigration hearing on April 29, 2003. At that point, counsel designated Tunisia as a country for return. Now, typically in asylum cases, the asylee would not designate a country if they feared returning to it and then – But can he designate a date? Can you answer Judge Wardlaw's question? In the record, there is no specific date of conversion, which, if you look at the Teslimi decision, is consistent. That it, a lot of times, in these religious epiphany cases, when a conversion applicant would pinpoint a date, that that is looked at with skepticism. In the Teslimi decision, you have the baptism, and the baptism as a ceremonial outward expression of a conversion. In this context of this faith, we don't have a point where there was either a physical ceremony or an observance. But what you do have is his testimony that explains when that was taking place and that it had reached its apex there in the spring of 2003. And more importantly, at that next hearing in September, counsel does make the notice that he will file the asylum application. And I think this gets into the BIA's months of time. Because there's no notice at that immigration hearing that if he waits and files the application in December, which is the window of time that the court set for it, that that period of time would be considered any type of delay. And when you look at it in that context, had the immigration attorney said, file it immediately, we'll take it immediately, or there was some question that that period of time would impact the reasonableness, then we're really looking at, using the BIA's months, closer to four and not six, which is even under what would be considered a presumptively reasonable period of time. And I understand the court's struggle with the lack of a date upon which to calculate reasonable time. And I think that overlaps the difficulty when we have a religious conversion case of establishing when that did occur. And in this case, this all circles back to there is a lack of a credibility determination. He's deemed credible. His testimony was consistent with how his religious evolution progressed. I point out in the record that as they challenged and they kind of hook on this beard question in this one sentence that was at the beginning of his testimony, that there isn't evidence coming back that shows that he wasn't wearing the beard through that period of time and that that hadn't been when the religious apex happened and that he hadn't consistently then practiced through it. Okay, so you're running out of time. Assume you get over the one-year bar. This is a practicing Muslim who's being deported to a Muslim country where even the president is required to be Muslim. What is the basis for your claim? Your Honor, entirely through the brief, Tunisia has been, especially now we look at the period of time because we're post-Arab Spring in this situation. But the period of time while the president was Muslim, this was a, and still continues to be, a country that is ethnically and culturally Muslim but has forbidden and prohibited the active religious practice of one's faith. And there is a fundamental difference between being a secular ethnic person and being an overt and devout practicing. And that is exactly where his adoption of this faith and his practice, especially the outward observance of his faith, if returned, will subject him to that persecution. But is that still true even after the Arab Spring? Well, I think, Your Honor, I looked at this question too. I know in the government's brief in the footnote they cite to the judicial notice question of the, at that point in time, the 2011 country conditions regarding religious persecution. And even since then, the country conditions, there's a 2013 report. Technically, under Fisher, you can't take judicial notice of that, and you're looking at that period of time. But what I think, even if you do reach that, you're going to find that the 2013 country reports demonstrate that there is incredible upheaval there. The tension that's in play and the powers that's in play. And I recognize the government's position in the brief that Tunisia is struggling with this terrorism question. And their response to that terrorism question has been to stamp out and eliminate any of the devout observance. I think since you're getting close to two minutes over, you need to kind of direct, not keep going off. That's where the problem is. If you want any time for rebuttal. Yes, thank you, Your Honor. All right. And we'll give you a minute for rebuttal. Good morning. Good morning. May it please the Court, I am Sarah Byrum, appearing on behalf of the Attorney General. Maybe because there are a lot of very basic questions in this case, maybe I can ask you a few to start out with. How do you determine the time when somebody who is instructed by lightning and suddenly says, I see the Lord, but develops a religious, deep religious faith over a period of time? How do you measure when that date is within which he must file in a reasonable time? When an applicant alleges changed circumstances, as in this case, and here it's the religious devotion, the petitioner has the burden of showing when his – That I know, but I ask how you measure it. Take this case. A man comes in and says, I suddenly – not suddenly. I started changing my evil ways and became a devout follower of the Lord Jesus over a period of time. I became more and more convinced as I went to church and I heard the priest tell me about all the miraculous things Jesus did. When do you determine that he became a sufficiently devout follower of the Lord? The petitioner would have to show that he is a sufficiently devout follower. That's his burden. Here, if we use petitioner's date, he claims that his growing devotion reached his apex, his worth, in 2003, spring of 2003. And that is when he feared returning to Tunisia because that is when he claims that he reached the apex. If we use spring of 2003, that's his own date, then he would be required to file within a reasonable time, a time sufficient enough for him to – And six months would be normally a reasonable time. There is no per se standard, but in some cases it could be reasonable. Here, we would argue that it's not reasonable because he made no effort to even indicate that he wanted to apply for asylum until September, essentially, when his adjustment claim went nowhere. And he said it was spring until September. Yes. How many months is that? It's unclear because we don't know exactly what –  Six months, yes. It could be around six months. Now, hasn't the board said that six months is ordinarily a reasonable time? It can be a reasonable time. But in this case, we also know that he was able to file his asylum application in as quickly as two months because he filed it in December after he notified his intention of – that he was going to file in September. But the issue is he makes no explanation for why, if he reached the apex of his increased devotion and he feared persecution, he didn't file in spring when he feared the persecution. So your answer is a reasonable time would be no time. When he reached the apex in the spring, he should have filed immediately. Yes. He should have filed immediately. So when did he file for the adjustment of status? I wanted to address your question earlier. For a timeline, he marries in February of 2003. He claims that he reaches his apex with his religious devotion in spring of 2003. At the April of 2003 hearing, his attorney claims that he is going to be pursuing adjustment of status through his new United States citizen wife. There is no mention of asylum whatsoever, despite the fact that he claims that he has this fear of persecution if he returns. We come back to the next hearing, which is in September, September 2nd of 2003. And when asked about the adjustment of status application, the attorney states there are some problems with the marriage right now, and they're probably not going to be getting married. That's a little confusion because they had allegedly been married already. But long story short, that there's problems that they're no longer going to be pursuing the marriage. And at that point is when he says, we are now going to file for asylum. So some of these months that have went by were entirely of his own creation. By choosing to pursue a different form of relief, although he claimed he was fearing return to Tunisia based on his increased devotion at that time. So what is a factual, you know, obviously, what's a factual determination here that we can't look at? Is there a factual determination with all of that in the backdrop that the reasonable time would have been when he's going to court and all of this and not putting all his eggs in one basket? Is that a factual determination? In our opinion, yes. We hold that, in fact, the Court can't even reach the untimeliness determination because he raises no legal question that regards an undisputed fact. Well, we don't reach it when there are disputed facts. Right. But it doesn't seem like these facts are disputed. They just seem vague and, I mean, but they're not disputed. No one's disputing that all these things that he said happened to him happened to him. With respect to the growing the beard, yes, we agree that he grew the beard, but there are facts in dispute as to when his religious devotion reached a date by which he feared returning. Okay, so what's the dispute on that? The dispute is that it's unclear exactly when. Well, that's not a dispute to say it's unclear. He says it's in the spring of 2003 or whatever it is. And what's the dispute? You agree with that or you disagree with it? And if you disagree with it, what's the position that creates the dispute? And after you answer that, I'd like to get to the merits because you've got about three minutes left and we haven't talked about what happens if you get past jurisdiction. We agree that the apex accordingly reached, you know, happened, occurred in the spring of 2003, but with... So there's no dispute about that? No, but Petitioner still needs to show, it's his burden to show a more specific date than something general as of spring 2003 to meet his burden. Okay. Now on the merits. Yes. If, let's say they banned, it's not just being a Muslim these days. The Sunnis and the Shiites are both Muslims and there's certainly a difference and a disagreement. Now within the Sunni religion is there may be, at least according to the Petitioner's theory, there may be a difference between what type of Sunni you are, a moderate Sunni or a fundamentalist Sunni. But let's just simplify the legal issue. If a country bans the practice of a religion, is that enough if you are an ardent member of that religion? Is that enough for you to say that I'm entitled to asylum because I can't practice my religion in that country? We don't believe that that would be enough. Those aren't quite the facts here. No, I'm not giving you the facts here. I'm asking you a legal question. No. You believe that in addition to the fact that you're not allowed to practice your religion, say Catholicism is banned in a Protestant country, what do you have to show? It says without harm in one of the cases that you rely on. What does it mean by without harm? If they say if you practice your Catholicism you will be incarcerated, is that enough? His allegation is that he's going to be tortured if he practices, right? He's going to be picked up at the airport and detained and tortured. I'm not asking you about this case. I'm trying to find the legal theory of what the government's position is on what constitutes. If it's simply a ban and those who practice Catholicism will be incarcerated or picked into jail from time to time, then what is it that you need to show in addition to the fact that you are banned from practicing your religion? In a situation like that, an alien would be required to show that he was individually singled out based on his religious practice. And in an issue, in a case like that where it would appear to apply countrywide, then that would be a country simply enforcing its religious code and therefore it would apply equally to all individuals in that country, which would thereby be insufficient for any one person to say that he was singled out. So any Catholic in a country where Catholicism is banned would not be entitled to asylum until he individually was put in jail. And would being put in jail for an indefinite term be persecution? It could be. The petitioner would have to show that he was individually singled out for persecution on account of his beliefs. All right. So if it's a general rule that you're not allowed to and it's contrary to law, each person has to wait to act for asylum until they put him in jail. Otherwise, an alien could attempt to bring a pattern or practice claim, but he hasn't shown that here. And in Fisher ---- I was really just interested in the government's position, because it's not an easy question. It's not. But as Judge Wardle points out, the facts in this case go beyond that. I just wanted to add. So somewhere in this record it says that he was arrested during the course of an investigation into terrorism in Los Angeles. Yes. So he was arrested and convicted for theft of illegal merchandise, counterfeiting merchandise. And the record indicates that he was arrested during a wider probe on terrorist activities. There's no indication that he was involved with those terrorist activities other than he happened to be picked up during the police's wide search. So it's not clear. And there's no record in the ---- excuse me, there's no evidence in the record indicating that he is or had anything to do with this. But was he ever convicted of anything? He was convicted of unlawful selling of counterfeit property. So he does have that conviction. But as to the allegations with respect to him being related to this terrorist probe, there's no indication that that actually panned out other than what was reported in the newspaper. So we have no further information on that. All right. Thank you. Thank you. Thank you, Your Honor. It's incredibly brief on my part to the questions of persecution. If you find that he's overcome the one-year bar and you're looking to the merits of the claim, the BIA did not touch the asylum question at all. It went straight to the withholding. So there is a question with this court on whether it can reach it. I think this court should, though, if it decides to remand it, that it can look to the persecution question because the BIA and its analysis on the persecution of the withholding cites directly to the IJ's reasoning on the persecution question, finding that the persecution had not been established. And this court can find that Mr. Vengalba has satisfied the well-founded fear of persecution by that 1 in 10 margin. So if this court is going to find and remand the rest of the asylum claim back to the BIA, I would ask that this court please keep its stay in place so that Mr. Vengalba remains in the country, even though he's detained pending a further outcome if this case goes that direction. If there's no further questions. I'm sorry, what was the last sentence you just said? That the stay remains in place, that this court's stay remains in place while the case, if it's remanded back to the BIA so Mr. Vengalba can stay in the United States even though he's still detained here. So he is detained here? He is detained here. He's been detained the entire period through the Board of Immigration Appeal and through the Ninth Circuit. I mean, isn't the general process is we give the stay till then when the mandate issues on our case, then you have to reapply for a stay? Well, you can issue the mandate, and because it's being remanded for that specific, pardon me, those specific questions to be addressed by the BIA as opposed to the BIA initiating its stay there. I can do that as well if it gets remanded, but. I think once the mandate issues, I think the stay goes away and you have to reapply. Thank you. Thank you. Thank you, Captain. The case is adjourned and will be submitted.
judges: REINHARDT, WARDLAW, CALLAHAN